UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

GARY PORTE,  )
 )
    Plaintiff(s),  )
 )
vs.  ) Case No. 4:07CV922 JCH
 )
LONG-TERM DISABILITY PLAN OF  )
THE MAY DEPARTMENT STORES  )
COMPANY,  )
 )
    Defendant(s).  )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Long-Term Disability Plan of The May Department Stores Company's (the "Plan") Motion for Summary Judgment, filed December 3, 2007, and Plaintiff Gary Porte's Motion for Summary Judgment, filed December 12, 2007. (Doc. Nos. 12, 19). The motions are fully briefed and ready for disposition.

## BACKGROUND

Plaintiff Gary Porte became a full-time employee of The May Department Stores Company on or about February 19, 1973. (Petition, attached to Defendant's Notice of Removal as Exh. A (hereinafter "Complaint" or "Compl."), Doc. No. 1-2, ¶ 4). At all times relevant hereto, Plaintiff was a qualified and vested participant in the Plan. (Id., ¶ 5).[1] Under the terms of the Plan, Plaintiff was entitled to certain disability benefits if he otherwise met the pertinent qualifications, including the requirement that he be "Totally Disabled" within the meaning of the Plan. (Defendant's Facts, ¶ 2).

---

[1] The Plan is an Employee Welfare Benefit Plan, as defined in section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 et seq. (Defendant's Statement of Uncontroverted Material Facts in Support of its Motion for Summary Judgment ("Defendant's Facts"), ¶ 1).

The Plan provided in relevant part as follows:

> 3.2 (a) The term Totally Disabled or Total Disability means the complete inability of a Member to engage in any and every duty pertaining to any occupation or employment for wage or profit for which the Member is or becomes reasonably qualified by training, education or experience, except that during the Elimination Period[2] plus the first twenty-four months of absence from work due to disability thereafter, the Member shall be deemed Totally Disabled while he is unable to perform the normal duties of his regular occupation and is not engaged in any other occupation or employment, other than Rehabilitative Employment, for wage or profit.

(Plan, attached to Brickson Aff. as Exh. B, Doc. No. 16, P. 13). Furthermore, the Summary Plan Description defined Total Disability as follows:

> "Total Disability" or "Totally Disabled" is defined as your inability to perform the normal functions of your regular occupation during the first two years and 90 days of your absence from work due to disability. After that time period, it is defined as being completely unable to perform any and every duty of any job for wage or profit that you are reasonably qualified by education, training or experience to perform.

(Summary Plan Description, attached to Brickson Aff. as Exh. C, Doc. No. 16, P. 66).

Pursuant to a delegation of administrative authority from the Plan sponsor, Metropolitan Life Insurance Company ("MetLife") is the Claims Administrator of the Plan. (Defendant's Facts, ¶ 3). In that capacity, MetLife interprets the Plan, and makes final determinations as to entitlement to benefits under the Plan. (Id.).[3]

---

[2] The Elimination Period consists of ninety consecutive days of Total Disability. (Plan, Doc. No. 16, P. 13).

[3] The Summary Plan Description in effect at the time Plaintiff's claim was denied provided in relevant part as follows: "May has delegated to MetLife the complete and sole authority, discretion and responsibility for interpreting the provisions of the Plan, administering claims for benefits, paying claims for benefits and determining whether Plan benefits are payable under the terms of the Plan. The decision by MetLife will be final and conclusive for any and all purposes." (Defendant's Facts, ¶ 42; Summary Plan Description, Doc. No. 16, P. 81).

On December 13, 2005, Plaintiff visited Dr. E.P. Trulock ("Dr. Trulock"), a pulmonologist with the Lung Transplant Office at Barnes-Jewish Hospital. (Administrative Record, attached to Suter Aff. as Exh. A, Doc. No. 15, PP. 34-35). Dr. Trulock indicated Plaintiff suffered from idiopathic bronchiectasis[4], including severe obstructive lung disease and chronic *pseudomonas aeruginosa* infection. (Id., P. 34). Dr. Trulock then stated in relevant part as follows:

> Gary returns today for a follow-up appointment. Since his last office appointment on 07/26/2005, Gary has been relatively stable from the pulmonary perspective. He has not had any exacerbations of his bronchiectasis. In spite of his severe pulmonary impairment, he has continued to work.
>
> Gary presents today in part because his position may be eliminated at the May Company, and he is concerned about his medical status. Certainly, based on his lung function, he would qualify as fully disabled from the pulmonary standpoint even though he has been able to continue to work through self determination and motivation.

(Id.). Dr. Trulock further stated that Plaintiff was an "[o]utwardly healthy appearing man, wearing supplemental oxygen, but having no respiratory difficulty," who suffered from "[b]ronchiectasis, with severe obstructive lung disease: clinically stable." (Id.).[5] Finally, Dr. Trulock recommended that Plaintiff continue his current medical regimen and exercise program, and return for reassessment in 3-4 months, or sooner if problems arose in the interim. (Id., P. 35). Dr. Trulock did not recommend that Plaintiff discontinue working at that time.

According to Plaintiff, on January 9, 2006, while actively working, Plaintiff became unable to perform his regular work solely by reason of severe bronchiectasis, shortness of breath, low energy

---

[4] According to Plaintiff, bronchiectasis is "an abnormal condition of the bronchial tree, characterized by irreversible dilation and destruction of the bronchial walls." (Plaintiff's Memorandum in Support of his Motion for Summary Judgment ("Plaintiff's Memo in Support"), Doc. No. 20, P. 1, quoting Mosby's Medical and Nursing Dictionary).

[5] Dr. Trulock stated that, "[Plaintiff's] lung function is clearly in a range consistent with disability associated with his lung disease." (Administrative Record, Doc. No. 15, P. 34).

levels, major physical limitations, and complete oxygen dependency. (Compl., ¶ 6). That same day, Plaintiff submitted to MetLife an Employee Statement for long-term disability benefits ("LTD" benefits). (Defendant's Facts, ¶ 4). Plaintiff noted on the Statement that his last day of work was January 9, 2006, that the date of his first treatment for his condition was "1998," and that his disability began in "1999." (Administrative Record, Doc. No. 15, P. 6). Plaintiff described the conditions preventing him from performing the duties of his job as follows: "shortness of breath/decreased lung function/energy levels low/oxygen dependent." (Id.).

On January 16, 2006, Dr. Trulock submitted to MetLife an Attending Physician Statement, in which he noted Plaintiff's initial date of treatment was June 25, 1996, and that he suffered primarily from bronchiectasis, and secondarily from chronic airway obstruction. (Administrative Record, Doc. No. 15, P. 7). Dr. Trulock further opined that Plaintiff was unable to perform his job duties due to "severe lung disease," and that he could work a total of "0" hours per day. (Id., P. 8).

On or about March 30, 2006, the May Department Stores Company ("May Company") submitted to MetLife an Employer Statement related to Plaintiff's claim, in which it noted Plaintiff's average hours worked per week was "40," and that his employment status as of January 10, 2006, his first date of absence, was "Active." (Administrative Record, Doc. No. 15, P. 4). The May Company further indicated that Plaintiff had experienced no previous absences from work due to disability. (Id.).

In a letter dated April 4, 2006, MetLife requested from Plaintiff additional information required to process his claim for LTD benefits, including, "**physician office notes regarding diagnosis and treatment information from January 1, 2006 to the present.**" (Administrative Record, Doc. No. 15, P. 9 (emphasis in original)). On April 18, 2006, Plaintiff visited Dr. Trulock, whose notes state in relevant part as follows:

> Gary returns today for a routine follow-up appointment. Since his last office appointment on 12/13/2005, Gary has been stable from the pulmonary standpoint. He has not had an exacerbation of his bronchiectasis, and his exercise tolerance has been stable....
>
> GENERAL APPEARANCE: Thin, but otherwise healthy appearing man, wearing supplemental oxygen, but having no respiratory difficulty....
>
> Bronchiectasis, with severe obstructive lung disease: clinically stable on his current medical regimen. Other problems as listed above: no interval change....
>
> Return here for reassessment in 3-4 months, sooner if problems arise in the interim.

(Id., PP. 15-16). In late April, 2006, Plaintiff submitted a number of additional documents to MetLife, including a second Attending Physician Statement from Dr. Trulock dated April 18, 2006. (Defendant's Facts, ¶ 18). In his Statement, Dr. Trulock again indicated that Plaintiff's initial date of treatment was June 25, 1996, that he was unable to perform his job duties due to "severe lung disease," and that he could work a total of "0" hours per day. (Id., PP. 12-13).

In a letter dated May 9, 2006, MetLife informed Plaintiff that his claim for LTD benefits was denied. (Administrative Record, Doc. No. 15, PP. 26-27). The letter stated in relevant part as follows:

> Your Plan states:
>
> Your Elimination Period begins on the day you become Disabled. It is a period of time during which an LTD Benefit is not payable. An LTD Benefit may begin after 90 consecutive days of Disability and continue while you remain Disabled until the end of your Maximum Benefit Period.
>
> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1. during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or

> 2. after the 24 month period, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.
>
> Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury. Economic factors such as, but not limited to, recession, job obsolescence, paycuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.
>
> You claimed disability from your job as a Merchandiser on January 9, 2006 due to bronchiectasis, and chronic airway obstruction. We referred the medical information received in regard to your condition to a medical consultant for review. The medical documents reviewed does not support long term disability benefits as there is no medical documentation from January 1, 2006 to April 2006 to support why you are unable to perform your own occupation. The medical records do not indicate when you have ceased your occupation. We need medical documentation from your last day of work of January 9, 2006 through your elimination period of April 10, 2006.
>
> Since the available medical documentation does not support that you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy, your claim has been denied.

(Id.).

Plaintiff again visited Dr. Trulock on May 23, 2006. (Defendant's Facts, ¶ 30). In his doctor's notes from that visit, Dr. Trulock stated that Plaintiff returned for a "special appointment," to address two issues: first, the denial of his application for long-term disability benefits, for which he was "formulating an appeal"; and second, his suffering from nasal congestion. (Administrative Record, Doc. No. 15, P. 30). Dr. Trulock reported that, "[f]rom the pulmonary standpoint, today Gary says that his overall condition is about the same." (Id.). Further, Dr. Trulock again concluded that Plaintiff was suffering no respiratory distress, and was currently stable on his maintenance medical regimen. (Id.). On May 30, 2006, Dr. Trulock submitted information directly to MetLife, in support of Plaintiff's appeal. (Id., P. 32). Dr. Trulock concluded that, as outlined in his office

notes, Plaintiff suffered from a severe, disabling pulmonary impairment. (Id.). He further noted, however, that "[d]uring the specified interval of January 1, 2006 through April 10, 2006, Mr. Porte did not have an office appointment." (Id.).

In or around July, 2006, the Social Security Administration determined that Plaintiff was entitled to Disability Insurance Benefits under the Social Security Act. (Compl., ¶ 7). Plaintiff began receiving such benefits on or about August 23, 2006. (Id.).

On August 28, 2006, Plaintiff filed a written notice of his appeal. (Administrative Record, Doc. No. 15, P. 41). MetLife then referred the matter to Clayton T. Cowl, a medical doctor board certified in pulmonary diseases. (Id., P. 42). After reviewing the documents in Plaintiff's claim file[6], Dr. Cowl provided the following assessment:

> The claimant is a 59-year-old male merchandiser with a history of idiopathic bronchiectasis dating back to at least July 2005 and likely longer. Pulmonary function testing in February 2005 suggested severe restrictive changes. Office visit notes from his treating pulmonologist suggest that the claimant's respiratory status was stable form December 2005 through May 2006 although the claimant was using supplemental oxygen....
>
> While there are data to suggest reduction in spirometric measurements and radiographic changes consistent with bronchiectasis, there are insufficient data to suggest the presence of functional limitations based on the data submitted for the dates in question [01/10/2006 through 04/10/2006 and beyond]....
>
> [The claimant] was apparently able to perform the physical maneuvers required in his job as a merchandiser but presented to his pulmonologist on 12/13/2005 in part to discuss his medical status as it pertained to his position being eliminated by his employer. The pulmonologist stated in the office visit note that "in spite of pulmonary impairment, he has continued to work," but also noted that Mr. Porte had been "relatively stable from a pulmonary perspective," without brochiectatic exacerbations. Subsequent notes do not suggest a significant change in the claimant's respiratory status from either a radiographic, clinical, or spirometric perspective.

---

[6] Dr. Cowl did not examine Plaintiff personally. (See Defendant's Response to Plaintiff's Statement of Uncontroverted Material Facts, Doc. No. 30, ¶ 18).

> There is only one spirometric measurement provided from February 2005 and this does not include lung volumes or diffusing capacity measurements. There are no other measurements of functional limitation provided such as a six-minute walk or a functional capacity assessment. There is no documentation of an oxygen titration study or pulse oximetry performed to document the need for supplemental oxygen. Therefore, while the claimant may have reduction in spirometric airflow consistent with restrictive changes and have radiographic evidence of bronchiectasis, there does not appear to be objective data to support severe functional limitation between 01/10/2006 through 04/10/2006 and beyond.

(Defendant's Facts, ¶ 39; Administrative Record, Doc. No. 15, PP. 46-48). Thereafter, MetLife denied Plaintiff's appeal on October 11, 2006, as follows:

> In summary, your plan states that you must be Totally Disabled during your elimination period of 90 days of your absence from work, in order to be eligible to receive Long Term Disability benefits. You left work on January 9, 2006. Therefore, the information must support a disability beginning January 9, 2006 through your elimination period ending on April 9, 2006 and beyond, in order to receive benefits. You have had idiopathic bronchiectasis since at least July 2005 and have continued working at your sedentary job position. When seen on December 13, 2005, although your physician indicates you qualify for disability, your condition had not changed. You were stable and you had no exacerbations. Therefore, we find you were not disabled through your elimination period, and no benefits are payable on your claim.

(Defendant's Facts, ¶ 40; Administrative Record, Doc. No. 15, PP. 50-51).

Plaintiff filed the instant Complaint on March 15, 2007, in Missouri State Court, claiming Defendant's decision to deny him benefits under the Plan was, "arbitrary, illegal, capricious, unreasonable and not made in good faith." (Compl., ¶ 12). Plaintiff further maintains he has suffered damages as a direct and proximate result of Defendant's actions, in an amount approximately equal to, "the amount of benefits due Plaintiff in accordance with the Long Term Disability Benefits plan for each month since January 9, 2006." (Id., ¶ 13). As stated above, Plaintiff and Defendant filed competing Motions for Summary Judgment on December 12, and December 3, 2007, respectively. (Doc. Nos. 19, 12).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

The Eighth Circuit has held that, "[u]nder ERISA, a plan participant may bring a civil action to 'recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" Pralutsky v.

Metropolitan Life Ins. Co., 435 F.3d 833, 837 (8th Cir.), quoting 29 U.S.C. § 1132(a)(1)(B), cert. denied, 127 S.Ct. 264 (2006). "The district court reviews de novo a denial of benefits in an ERISA case, *unless* a plan administrator has discretionary power to construe uncertain terms or to make eligibility determinations, when review is for abuse of discretion." Rittenhouse v. UnitedHealth Group Long Term Disability Ins. Plan, 476 F.3d 626, 628 (8th Cir. 2007) (emphasis in original) (citation omitted).

In the instant case, Plaintiff acknowledges that because the Plan allotted MetLife the discretionary authority to determine eligibility for benefits, the standard of review for this Court is abuse of discretion. (See Plaintiff's Memo in Support, P. 2).

> Under the abuse of discretion standard, the proper inquiry is whether the plan administrator's decision was reasonable; *i.e.*, supported by substantial evidence. In considering the reasonableness of a plan administrator's fact-based disability determination, courts should consider whether the decision is supported by substantial evidence. Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Fletcher-Merrit v. NorAm Energy Corp., 250 F.3d 1174, 1179 (8th Cir. 2001) (internal quotations and citations omitted).[7]

Upon consideration of the record before it, the Court cannot say the Plan Administrator abused its discretion in denying Plaintiff long-term disability benefits, for several reasons. First, as noted above, the Plan defined the term "Total Disability" as follows: "[T]he complete inability of a Member to engage in any and every duty pertaining to any occupation or employment for wage or

---

[7] Plaintiff asserts MetLife's potential conflict of interest, due to its authority to decide whether an employee is eligible for benefits and its eventual obligation to pay those benefits, must be weighed as a factor in determining whether there was an abuse of discretion. (Plaintiff's Reply to Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, Doc. No. 31, P. 2). Because Plaintiff raised this argument for the first time in his reply brief, the Court will not address it here.

profit for which the Member is or becomes reasonably qualified by training, education or experience, except that during the Elimination Period plus the first twenty-four months of absence from work due to disability thereafter, the Member shall be deemed Totally Disabled while he is unable to perform the normal duties of his regular occupation and is not engaged in any other occupation or employment, other than Rehabilitative Employment, for wage or profit." (Plan, Doc. No. 16, P. 13).

The first time Plaintiff's treating physician addressed the issue of disability was on December 13, 2005, when he stated that Plaintiff was, "fully disabled from the pulmonary standpoint." (Administrative Record, Doc. No. 15, P. 34). At that time, however, Dr. Trulock also noted that Plaintiff's visit was due in part to the fact that, "his position may be eliminated at the May Company, and he is concerned about his medical status." (Id.). Dr. Trulock further indicated that Plaintiff was continuing to work, albeit only through his utilization of self determination and motivation, and did not recommend that Plaintiff discontinue working at that time. (Id.).

It is undisputed that after his December 13, 2005, appointment, Plaintiff continued to perform all the duties of his regular job through January 8, 2006. Although Dr. Trulock then indicated Plaintiff could work a total of "0" hours per day in his January 16, 2006, Attending Physician Statement, he provided absolutely no medical evidence reflecting an appreciable change in Plaintiff's physical condition between the time he was working in 2005 and early 2006, and his application for disability benefits on January 9, 2006. (Administrative Record, Doc. No. 15, PP. 7-8). Rather, Dr. Trulock acknowledged, among other things, that Plaintiff could sit for a total of eight hours, stand for a total of three, and walk for a total of two, capabilities that would permit him to perform the functions of his job as described by his employer. (Compare Administrative Record, Doc. No. 15, PP. 5 and 8). Finally, the Court notes that the entirety of the medical evidence before the Plan Administrator established that Plaintiff's condition remained stable from July, 2005, a time during

which Plaintiff was performing the duties of his position without incident, through at least May, 2006, when he was appealing the decision denying him LTD benefits. (See Administrative Record, Doc. No. 15, PP. 34, 15, 30). Taken together, the above circumstances constitute far more than a "scintilla of evidence" refuting Plaintiff's treating physician's opinion that Plaintiff was completely unable to work. See House v. Paul Revere Life Ins. Co., 241 F.3d 1045, 1048 (8th Cir. 2001).

Finally, in further support of its ruling the Court notes that during its review, the Plan Administrator obtained a separate opinion from an independent physician, Dr. Clayton T. Cowl.[8] (Defendant's Memorandum in Support of its Motion for Summary Judgment, Doc. No. 13, P. 12). Dr. Cowl, who is board-certified in pulmonary diseases, concluded there existed no objective data supporting a finding of severe functional limitation on Plaintiff's ability to work between January 10, 2006, and April 10, 2006, the Elimination Period under the Plan. (Id.).[9]

In light of the foregoing, the Court finds the Plan Administrator offered a "reasonable explanation for its decision." Fletcher-Merrit, 250 F.3d at 1180. See also Johnson v. Metropolitan Life Ins. Co., 437 F.3d 809, 814 (8th Cir. 2006) (citation omitted) ("When there is a conflict of opinion between a claimant's treating physicians and the plan administrator's reviewing physicians, the plan administrator has discretion to deny benefits unless the record does not support denial").

---

[8] The Court recognizes that, "[a] reviewing physician's opinion is generally accorded less deference than that of a treating physician." Fletcher-Merrit, 250 F.3d at 1180 n. 3 (citation omitted). "However, the treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Id. (internal quotations and citation omitted). In the instant case, the Court's review of the record as a whole does not support Dr. Trulock's assessment that Plaintiff was unable to perform the duties of his regular position during the relevant time period.

[9] The stability of Plaintiff's condition, coupled with Dr. Cowl's opinion that Plaintiff was not disabled during the relevant time frame, distinguishes this case from Seitz v. Metropolitan Life Ins. Company, 433 F.3d 647 (8th Cir. 2006). In that case, every doctor who examined Seitz, including the independent examiner selected by MetLife, agreed that Seitz was limited to sitting for no more than two hours during the day, and thus physically unable to fulfill at least one material aspect of his job. Id. at 650-51.

Thus, even if another reasonable interpretation exists, the Plan's decision to deny Plaintiff benefits was not arbitrary and capricious, and this Court, "may not simply substitute its opinion for that of the plan administrator." Fletcher-Merrit, 250 F.3d at 1180. See also Rittenhouse, 476 F.3d at 632 (internal quotations and citation omitted) ("[The Plan's] decision is supported by substantial evidence, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."). Defendant's Motion for Summary Judgment must therefore be granted.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 12) is **GRANTED**, and Plaintiff's Complaint is **DISMISSED** with prejudice. An appropriate Order of Dismissal will accompany this Memorandum and Order.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. No. 19) is **DENIED**.

Dated this 29th day of January, 2008.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE